United States Department of Health and Human Services, Ed Powell. This is a question for the appellant, Ms. Stroman, before the appellant. Good morning. Excuse me.  a case involving a woman who is a what we all in this field come to know, love and know as federally qualified health centers. In Medicare and Medicaid, but in Medicare especially since that's where this is taking place, there are two kinds of definitions that operate. One is something called federally qualified health center services, and the other is federally qualified health center. The two are pretty much the same except that a federally qualified health center can provide services in Medicare and certainly in Medicaid that are different from federally qualified health center services which are tied into getting extra money in case a managed care organization doesn't pay the FQHC a level that Congress has concluded is necessary for the I have a threshold question. Just trying to understand your claim. Your complaint alleges a 706.1 claim and it alleges that the agency has failed to act based on an unambiguous interpretation of the statute. That's the way you pled it. What if we find that the interpretation that you seek is not an unambiguous interpretation of the statute? In other words, it's only a correct interpretation but not an unambiguous. I think you have to still give a fact because the underlying intent of the law and the law in this case would be to take a requirement that applies to FQHCs when it's conducting Part B business when one is and move over one requirement which is that these managed care organizations in Part B which then become really pharmacy entities which take risk in Part D. If the goal of the statute is clearly to make certain that those entities pay FQHCs not less than they pay the other parties that are doing the same service, then the answer has to be that the FQHCs get that same pay not less than privilege or right or entitlement they have in Part B to Part D. They would have it also in Part D. I guess the question that I have is that the way that 706.1 claims work and the Supreme Court said this in the Norton v. SUWA case, the Southern Utah Wilderness Association case, that 706.1 claim of this sort is really akin to a mandamus claim where you have to establish something akin to clear and indisputable entitlement to relief. That's the way you put it below and I guess what I'm trying to understand is that normally if a statute is ambiguous then the agency gets the first crack at interpreting it and then if it were to come to us on review that interpretation would get Chevron deference. It seems that your lawsuit is going to do an end run around that if we were to believe that the statute were ambiguous because you're saying that even if it is ambiguous we should just pick your case also reasonably. So the ambiguity that I think we're talking about is the ultimate meaning of language of substantive language. The non-ambiguity and the necessity is, and it's clear simply from the language of the statute, and by the way something that CMS does not fight against is there is a mandatory carrying in of a contract clause which has words in it or statutory words in it. There is absolutely no doubt under the statute that CMS was supposed to in its contracts contain a clause stating that this payment had to be made, the pay not less than requirement had to be made. There's no ambiguity with respect to that. There's no ambiguity that that language in that applies right now to Part B the pay not less than language is to be moved into Part D. So to me the real question is okay, now you're moving the language in. That you have to do. There's just no ambiguity whatsoever attached to that. Now you're moving the language in. The question is do you give vitality to the language or do you look as the district court did and as HHS argues, do you look to the language and you say well, when it's in Part B we don't think we think it really means federally qualified health center services federally qualified health center services as a defined term means work. It does not contain pharmacy and so what you have is you have a dead end or a voiding of any meaning. But the language itself the contract clause itself has to be mandatorily moved in. Then the question is do you give it vitality? Of course our argument is that Congress generally is presumed not to want to enact laws that have no meaning which would weigh in favor of construing it in our manner or the way we say it. And secondly, that when you wind up with this contract, if you follow it through and you put the contract clause into your contract, the end result because of the way it gets carried into Part D and then changed a little bit to fit Part D then you I see your point about the language is mandatory. This provision has to be in the contract. Right? That's what you're arguing. Yes. Okay. But I don't know how that helps you because that section that requires it says it shall require the organization to provide here in any written agreement between the organization and the federally for level and amount of payment to the federally qualified health center for services provided by such health center. It still raises the question that it still raises the question about what does that mean for services provided by such health center? We still have to define that term. Don't we? So I'm sorry, Ron. I'm not sure where the way where I take this is if you will where I take this is obviously pharmacy is a service and you can see from the regulations of CMS that it's treated as a service. So if you have a service and you have language that says a federally qualified health center service, if there is one and there's a contract with these organizations, they get paid not less than, there's no ambiguity. You have to take that federally qualified health that language that gets moved in and you have to read it as though it's this term of art going back to 1395X. It isn't the term of art going back to 1395X. There's obviously an intent to have a result where the pay not less than requirement is effective because the moving in provision, it's 112, actually talks about having it wind up being treated in the same manner as under Part B. Mr. Feldesman, the 112 moving in provision that you talk about has an impact on other provisions other than 27E3A. Yes, it does. And my question is even if you are right on the services provided by such health center not being one and the same as the X definition of FQHC services, you have another barrier which is the reference in 27E3A to a written agreement because at least that written agreement means the written agreement provided under 23A4 that has to do with the payment of the wraparound payment. And so at least one function that the not less than language in 27E3A is fulfilling is to require that the wraparound payment not become a slush fund for the organizations, right? And the question is if written agreement which is defined in terms of W23A3 is just that written agreement, then how do you get to the point where, oh, you're saying the written agreement also addresses a prescription drug plan? Well, because what we say is and I do see my time is out. You can answer her question. So the way we address it is we talk about that Section 151 which we refer to at least at some point as our translation or translator. And 151 does it does indicate that you're moving by definition that the contract under Part B which is to a Medicare Advantage type plan is now a contract with either a PDP or an MAPD in the shorthand used in Part D. So you've taken the contract which was previously with an MA entity, then you've moved it over by virtue of 151 and you've said the contract is now with these other guys. That addresses contract. And I don't know, maybe you're getting to this. I don't want to cut you off if you are. So the contract under this section now includes the contract insofar as it addresses pharmaceutical. But there's also this reference to any written agreement described in W23A4. And that's a much more particular So, for example, if the organization said, okay, we're going to comply with the statute. We're going to have a written agreement that deals with wraparound. And then we're going to have a separate written agreement that deals with prescription drugs. Then the not less than language would only apply to the written agreement with respect to the services that are covered by wraparound and not to the pharmaceutical services. So the wraparound provision only applies or only pertains if the money that the entity gets, the FQAC gets, is less than the sum to which it's entitled. That whole entitlement really applies to Part B. That entitlement doesn't carry into Part D. Because there's no government operation sitting side by side. Part D is just contractors to the agency. So there's no sort of, if you will, secondary party that can make good. And the idea, we think, is that to read it consistently, this is not a hallmark of clarity by Congress by any stretch. Nobody should put a gold medal on its chest over the way it wrote this. But I think when you have something that says it's supposed to affect in the same manner as it does in Part B, which means it's pay not less than, and when you go to the effort of saying it has to be moved over, there has to be something in the agreement between the agency in this instance where yes, with the agency saying that the entity responsible for has to do this, has to in this instance pay not less than, that's how we reach the answer that we do, Judge. It's that logic. Okay. We'll hear from the government. Maybe he'll explain this to us. I'm sorry? I said we'll hear from the government. Oh, thank you. Yeah, your time is up. No, it's okay. Good morning. May it please the Court, Karen Schoen on behalf of the government. The District Court correctly held that the provision at issue here applies only to federally qualified health center services. Plaintiff's argument is that Congress meant something different because it referred to, quote, services provided by a health center. But when you look at other provisions in the statute, it's clear that Congress used those terms interchangeably. And I can come back and give some examples if that would be helpful. But just to finish the point here, so when Congress referred to services provided by a health center in this pay not less than provision, Congress was referring to federally qualified health center services which don't include Part D prescription drugs. And that's not surprising given that the pay not less than requirement goes hand in hand with the provision directing CMS to make a supplemental payment to health centers in certain circumstances. And as we were just saying, that supplemental payment applies only to federally qualified health center services, not to Part D. Now, those two provisions, the pay not less than requirement and the supplemental payment provision, were enacted together in the same section of the Medicare Modernization Act. And the two go hand in hand. The pay not less than provision protects the Medicare Trust Fund in light of that supplemental payment. As CMS has explained, the provision is designed to prevent Medicare Advantage organizations and health centers taking advantage of that supplemental payment by agreeing to artificially low rates, knowing that the health center will get a supplemental payment from CMS to make up the difference. And since there's no supplemental payment in Part D, there's really no reason to apply. It's a little bit different, but it does seem like there's a parallel argument that CARES is making here, which is when you have Part D, 112B3D carrying the 27E3A not less than provision into Part D, you know, and they've, you know, quite effectively in their brief quoted the 27E3A not less than provision and inserting the prescription drug plan sponsors into it. And the question is, what role does that play, if not the role that they assign to it, which is that a reimbursement for prescription drug coverage provided by an FQHC is going to be reimbursed at a not less than rate? Well, I think, you know, as a practical matter, it has no real effect because Part D prescription, because sponsors of Part D plans don't enter into contracts with federally qualified health center services, centers, rather, for the provision of federally qualified health centers. So bracketing your argument, I do understand your argument, and I do appreciate that that's the argument that was persuasive to the district court, and I'm not saying it won't be persuasive to us, but just to understand the different pieces of your argument, if you put aside that argument about the use of the term slightly different, federally qualified health center services versus services provided by such health center, and you look at the rest of the logic of this, assuming that there's room to look at the rest of it, the question then becomes, what is the carry into Part D of 27E3A accomplishing? And I guess your answer is, well, it doesn't really. It doesn't really. I mean, I think as the district court recognized and as we recognized in our brief, it is surplusage. We don't think it's doing any real work. But I think if you look at that provision 1395 W-27E3, subparagraph A is the pay not less than provision. If you look at subparagraph B, which would also get incorporated along with it, it clearly contemplates that the pay not less than requirement goes hand in hand with the supplemental payment, because if you look at subparagraph B, and this is on page A6 of our addendum, the addendum at the back of our brief, it clearly contemplates that when that pay not less than requirement applies, the health center would also be eligible for a supplemental payment, and that's the reference to 1395 LA3B in that subsection B. So again, this is 1395 W-27E3, and I'm looking at A and B together. So, looking at the 340B benefit that Congress is trying to provide to the federally qualified health centers, that gives those centers a drug discount, and it's supposed to benefit them and make them stretch their dollars further. And under your reading, that still has a function for patients that have no insurance coverage at all, because the federally qualified health centers have to pay for those drugs, and it's 340B. But the argument, I gather, that CARES is making is that when this all was enacted, there were, you know, basically the relevant contracts that deal with what Humana has to cover aren't nuanced for the patients that are going to be Medicare Part D patients and other patients. And so at the end of the day, the market is not going to give Humana less money because of the drug discount. They're just going to pocket a benefit that comes out of the 340B program, which just doesn't really make sense in terms of Congress's intent. I mean, there's this sort of pocket of money that's out there. It's not even going back to CMS, is it? Let alone to the bottom. Well, I mean, I guess in theory, it could potentially go back to CMS in the sense that there are CMS does make subsidy payments to Part D sponsors. Now, as a practical matter, whether it has any effect in the subsidies that CMS would provide, we have no way of knowing. You know, it would just to think about it, Part D sponsors make bids to CMS. And so to the extent that a Part D plan sponsor is lowering its costs, it may submit a lower bid to CMS and that may require lower subsidy payments. As a practical matter, though, it's unclear how large this would be. And so it may not make a big difference either way. But it could, at least in theory. But I think the more sort of fundamental point is that the 340B discount drug program is under a separate statute. It's a separate and distinct program from Medicare. And there's nothing in the statute governing the 340B program that suggests that Congress intended federally qualified health centers to retain the benefit of discounted drugs under Medicare. And I think, you know, and it's important also to keep in mind that federally qualified health centers don't just provide care to Medicare beneficiaries. As you just noted, Judge Peller, you know, they do provide care to underserved communities and provide care to individuals without any insurance. And so there is still a benefit for health centers to retain. Are there any other I mean, other than the services that are subject to the wraparound supplemental payments and the Part D pharmaceutical pricing that the plaintiffs are asking for here, is there any other pricing that's arguably affected one way or the other by your position or by the plaintiff's position on not less than? I mean, if they were to win, are there other things that the not less than would then apply to? I don't think so, Your Honor. I think this would have limited effect to what we've just been talking about here. I'd be happy to answer any further questions. Thank you. Thank you, Your Honor. Counsel's out of time, right? Pardon me? Yeah, okay. You can take a minute if you'd like. Thank you. Mr. Pelsman, I have a question for you, which is about the... This won't count. This won't count. You get your minute. About the 340B program. 340B lowers the price. It requires in effect pharmaceutical companies to give a discount to federally qualified health centers. The notion that in doing that, Congress also intended to extract from PDP sponsors an additional subsidy for the work of FQHCs seems implausible, says CMS. So the question is, I mean, to me, yes. There are discounts all over the place in this program, but the idea is, from the 340B, is for the health centers to be able to make that extra profit because they get these things very cheaply. And the discount that they're... The discount is really for the purposes of lowering drug prices to beneficiaries, not necessarily with respect to the pharmacy. I mean, there's CVS, Rite Aid, and so forth. They're making a profit off Part D. It's not like that any of these discounts really are winding up in their pockets, or at least they shouldn't be. And so, if I've answered your question to my minute, my minute would be this. There's a history in this program from really going back to 1989 and 1990 of saying that this is... These FQHCs really are creatures of Congress, and what we don't want is we don't want those programs to be, in effect, tapped. Their money that they have for non-paid patients who need services. We don't want it diluted by having to subsidize other programs for it. All I can say is in this regard is, if you pay a health center in Part D, not less than you're paying Rite Aid or whoever, whatever else the major entity is, you are going to at least cover the health center's costs and not force it to, in effect, subsidize with Part D using 330. And so, the idea, I think, is if you just put everything together, the notion that you get in Part D, you get not less than what others would pay for the same service, coincides with the goals of Section 330, and it means that, in essence, money that comes through 330 retains its ability to be used wholly and completely for parties that don't have any money, can't afford to pay, and the health center is getting nothing for them. So, I think when you look at this in a kind of global way or a comprehensive way, you can see the common sense and consistency of the pay not less than provision applying to Part D. That was what I wanted to say. Thank you. Thank you both for your helpful arguments.
judges: Tatel, Pillard, Wilkins